IN THE CIRCUIT COURT OF THE

11TH

JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

FAMILY DIVISION

CASE NO.   04-23562 FC 12

IN RE: THE MARRIAGE OF

VANESSA HERNANDEZ,

　　　Petitioner/Wife,

and

HARVEY HERNANDEZ,

　　　Respondent/Husband.

_____/

## MEDIATED MARITAL SETTLEMENT AGREEMENT

AGREEMENT, made and entered into this 14ᵗʰ day of September, 2005, by

and between VANESSA HERNANDEZ, residing in Coral Gables, Miami-Dade

County, Florida, hereinafter referred to as the Wife, and HARVEY

HERNANDEZ, a resident of Miami, Miami-Dade County, Florida, hereinafter

referred to as the Husband (with the Husband and Wife being sometimes referred

to collectively as the "Parties"). The Parties appeared for mediation on July 22,

2005, August 9, 2005, ~~and~~ September 1, 2005 *and September 14, 2005* and agreed to resolve the above

captioned matter.

**WITNESS THAT:**

**WHEREAS,** the Parties were lawfully married to each other on March 18,





**EXHIBIT**

**A**

1997, in Miami, Miami-Dade County, Florida:

WHEREAS, the marriage of the Parties is irretrievably broken resulting in the Wife's filing a Petition for Dissolution of Marriage on September 10, 2004;

WHEREAS, the Parties desire to settle and adjust their property rights and financial relations with each other; and

WHEREAS; two (2) children were born of this marriage, to wit:

* Alessandra Nicole Hernandez, female, born on October 10, 2002;

* Harvey Rafael Hernandez, male, born on March 18, 2004;

NOW THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree, each with the other, as follows:

1. RECITALS. The above recitals are true and correct, and each party relies upon them in entering into this Agreement.

2. RELEASE OF ALL CLAIMS. The Husband and Wife mutually forever renounce and relinquish all claims of whatever nature, including but not limited to tort and contract claims, except as specified in this Mediated Marital Settlement Agreement, and further renounce and relinquish all claims which each may have in or to any property or estate of whatsoever kind, now or hereafter owned or possessed by the other, except as specified in this Mediated Marital





②

Settlement Agreement.

3.   **INDIVIDUAL ENTERPRISE**. It shall be lawful for each of the Parties to conduct, carry on and engage in any employment, business or trade, free from control, restraint or interference, directly or indirectly, by the other in all respects, as if such party were single and unmarried. It is agreed that neither party shall molest or harass the other in any manner whatsoever.

4.   **COVENANT AGAINST CHARGING CREDIT OF OTHERS**. The Wife shall not at any time contract or incur any liabilities on behalf of the Husband, nor take any action which might obligate or charge the Husband's credit in any manner except as set forth herein.

The Husband shall not at any time contract or incur any liabilities on behalf of the Wife, nor take any action which might obligate or charge her credit in any manner except as set forth herein.



5.   **EXECUTION OF FURTHER INSTRUMENTS UPON DEMAND**. Each of the Parties shall make, execute, acknowledge and deliver any and all such further or other instruments to the other which shall be reasonably required for the purpose of giving full force and effect to this Agreement and the covenants, conditions and provisions thereof.

6.   **PERSONAL PROPERTY**. The Parties have heretofore divided their own personal property to their mutual satisfaction, as set forth in paragraph 14, et seq. Henceforth, each shall own and enjoy, independently of any claim or



right of the other, all items of personal property of every kind, whether now or hereafter owned by him or her, with power to dispose of same as fully as if either he or she were unmarried, except as specifically otherwise provided herein.

7. **SPECIFIC COVENANT FOR RELEASE ELECTIVE SHARE**.

Each of the Parties agrees that he or she will upon request of the other execute good and sufficient releases of an elective share in any real estate of either of the Parties, now owned, or hereafter acquired by him or her, to the other party hereto, his or her devisees, heirs and assigns or to any other person that either of the Parties or, his or her devisees, heirs, or assigns, may designate.



8. **SPECIFIC COVENANTS TO EXECUTE DEEDS TO REALTY, ETC.** In the event either party shall hereafter sell or convey any land now owned, or hereafter acquired, by them individually, and if in such sale or conveyance, it shall be required that the other party who owns no actual present interest therein, join in the execution of the deed, the Parties agree that each will upon request join in execution of such deed or deeds without payment or consideration. In the event a party is requested to enter into a conveyance of property pursuant to the terms of this Agreement, the consenting party shall bear no income tax consequences as a result of his/her consent.

9. **RELEASE OF CLAIMS AGAINST ESTATE OF OTHER PARTY**. Each of the Parties specifically waives, renounces and releases any and every statutory right of election, as surviving spouse, to take, claim, demand and



(4)



receive any share or part of the estate of the other party, except for the payment provisions as set forth in this Mediated Marital Settlement Agreement, as against any will heretofore or hereafter made by the party so dying, as well as any and every intestate interest or distributive share of, in and to the estate and the property of the party so dying, except for the payment provisions as set forth in this Mediated Marital Settlement Agreement, to which the survivor might otherwise be entitled, under any statutes now or hereafter in force or effect which may be provided by the laws, customs or usages of any governmental authority having jurisdiction as herein provided.

10.   **COVENANT TO EXECUTE: DEMAND OF PERSONAL REPRESENTATIVE**.  Each of the Parties covenants and agrees that at the request of the other, or, in the event of his or her death at the request of his or her legal representative, he or she will execute forthwith upon demand and deliver any and all necessary or proper instruments to carry out the purposes and intent of this Agreement.



11.   **COVENANT TO MARK THE AGREEMENT FOR IDENTIFICATION AND TO FILE AGREEMENT FOR PURPOSES OF ENFORCEMENT AND/OR MODIFICATION**.  Each of the Parties agrees to ask the Court to mark this Agreement for identification at Final Hearing. The parties agree not to file this Agreement at this time. However, in the event of an enforcement and/or a modification proceeding, the parties shall file this Agreement





with the Court.

12. <u>**AGREEMENT NOT MERGED IN FINAL JUDGMENT**</u>.

Inclusion of the provisions of this Agreement in any such interlocutory or final judgment entered in a cause as herein above described shall not cancel, void or in any way modify the terms of this Agreement and the binding nature thereof upon the Parties during their respective lifetimes or upon the personal representative of their respective estates after death.

13. <u>**COVENANT AGAINST INTERFERENCE WITH OTHER PARTY**</u>. Neither party shall molest, interfere with or harass the other, and neither shall come onto, trespass or disturb the possessions of the other or any real or personal property identified in this Agreement, or hereinafter acquired.



14. <u>**EQUITABLE DISTRIBUTION**</u>. In order to achieve equitable distribution as premised on the disclosure of assets and liabilities and other information provided and utilized, the Parties have agreed to the division of their assets and liabilities as set forth below.  All transfers between the Parties are made incident to the dissolution of marriage and it is the Parties' intention that they be non-taxable pursuant to IRC Section 1041 and other applicable provisions.

14.1 <u>**PERSONAL PROPERTY**</u>: The Wife shall be entitled to retain as her sole and exclusive property, all of the furniture, furnishings, artwork and personalty which are located at the former marital residence at 690 Solano Prado, Coral Gables, Florida, except for the items set forth in Exhibit A which shall be the





*except for Dinghy which husband will pickup*



Husband's sole and exclusive property. All items listed in Exhibit "A" shall be delivered by the Wife to the Husband within five (5) days of the execution of this Agreement. The Husband shall be entitled to retain as his sole and exclusive property, all of the furniture, furnishings, artwork and personalty located at Apt. 903, at 1331 Brickell Bay Drive, Miami, Florida.

14.1.1.  The Wife shall have sole possession and ownership of her personal jewelry, her personal effects and her personal clothing. The Husband shall have sole possession and ownership of his personal jewelry, personal effects and his personal clothing located at 1331 Brickell Bay Drive, Apt. 903, Miami, FL.

14.2. **Automobiles**:  The Wife shall have sole possession of her 2004 Lexus LX470 motor vehicle. The Wife shall be solely responsible for any loan payments, costs, maintenance and insurance associated with the vehicle she is retaining, and she shall indemnify and hold the Husband harmless with respect thereto.

14.2.1. The Husband shall have sole possession and ownership of the Parties' Porsche Carrera automobile, 2004 Range Rover and motorcycle. The Husband shall be solely responsible for any loan payments, costs, maintenance and insurance associated with the vehicles he is retaining, and he shall indemnify and hold the Wife harmless with respect thereto.

14.3. **Boats**: The Wife shall have sole possession and ownership of the Parties' Contender vessel. Except as set forth in the Temporary Support Agreement, the Wife shall be solely responsible for any costs, maintenance and insurance



⑦

associated with the boat she is retaining, and she shall indemnify and hold the Husband harmless with respect thereto.14.3.1. The Husband shall have sole possession and ownership of the Parties' dinghy a/k/a dinky and jet ski. The Wife shall deliver the dinghy to the Husband within five (5) days of the execution of this agreement. The Ferretti boat shall be sold as set forth below. The Husband shall be solely responsible for any loan payments, costs, maintenance and insurance associated with the Ferretti boat until it is sold, the dinghy and jet ski he is retaining, and he shall indemnify and hold the Wife harmless with respect thereto.

14.4. **Marital Residence**: Contemporaneous with the execution of this Agreement, the Husband joined by the Wife shall execute a Quit Claim Deed thereby conveying to the Wife all of his right, title and interest in and to said real property located at **690 Solano Prado, Coral Gables, Florida.** The Husband shall assign to the Wife all of his right, title and interest in the homeowner's insurance policy covering the aforesaid real property. Further, the Husband shall assign to the Wife all of his right, title and interest in the utility and other deposits. The Wife shall receive said property free and clear from any liens or encumbrances subject to the terms set forth below.

14.4.1 The Husband shall be solely responsible for the real estate taxes on the marital home prior to the execution of this Agreement including but not limited to the 2004 real estate taxes and any penalties related thereto and the prorated 9/12 of the 2005 taxes through the execution of this Agreement. The delinquent taxes and







penalties related thereto shall be paid by the Husband within thirty (30) days from the execution of this agreement. The real property taxes which are prorated 9/12 of the 2005 taxes shall be paid by the Husband within thirty (30) days to Wife's attorneys **trust account** for the benefit of Wife to pay said real estate taxes. The Husband represents that there are no other outstanding taxes, liens or encumbrances against the marital home other than the Ocean Bank credit line in the sum of approximately One Million Eight Hundred Ninety Two Thousand ($1,892,000.00) Dollars and the real estate taxes set forth in this paragraph. Notwithstanding, Husband shall be solely responsible for and he shall pay any and all other taxes, liens, encumbrances etc. which predate the execution of this Agreement. Husband shall be entitled to the tax deduction for the payment of his obligations referred to in this paragraph.

14.4.2. The Husband assumes and agree to pay the existing line of credit encumbering said property in favor of Ocean Bank ("Ocean Bank credit line") in the sum of approximately One Million Eight Hundred Ninety Two Thousand ($1,892,000.00) Dollars, and indemnifies and holds the Wife harmless from any liability thereon. Neither party shall further borrow on said line of credit. Simultaneous with the execution of this Agreement the parties shall notify Ocean Bank in writing prohibiting any further advances to either party. Further the Husband shall instruct Ocean Bank to provide the Wife with current statements on the line of credit until said line of credit has been paid in full. Husband shall be



(9)





solely responsible for and he shall pay the monthly interest and principal payments<sub>∧</sub> on a timely baisis

until said obligation is satisfied.

14.4.2.1. The Husband shall pay the balance owed on the Ocean Bank credit line from any of the following sources, as soon as the proceeds are available:

A. The net proceeds of the sale of the Ferretti yacht.

B. The net proceeds from the sale of the property at 3670 Bird Road,

or the

sale of the contract in lieu of the sale of the actual property. C. Seventy-five (75%) of the cash flow (return of capital, profits, distributions) from any or all of his projects including but not limited to the following until the credit line has been fully satisfied:

i. 100 Douglas Apartments, LLC. The Husband represents that he expects to receive in October 2005, approximately one million ($1,000,000.00) dollars, before taxes.

ii. Solaris At Brickell Bay, LLC. The Husband represents that he expects to receive on or before June 30, 2006, the sum of two million ($2,000,000.00) dollars, before taxes.

iii. Mediterranea, LLC. The Husband represents that he expects to receive during the third quarter of 2006, the sum of one million ($1,000,000.00) dollars, before taxes.

The parties agree that the Husband shall pay off the Ocean Bank mortgage/credit





line in full no later than December 9, 2006. The Husband's obligation to pay off

the Ocean Bank credit line no later than December 9, 2006 is independent of and is

not contingent upon the date of the closing of the sale of the Ferretti Yacht or the

Bird Road real property or his receipt of the cash flow from his projects. *, within 5days of the execution*

14.4.3. The Husband shall immediately list for sale and use his best

efforts to sell the 72 foot Ferretti yacht.  The Husband shall provide Wife with a

copy of the listing agreement.

**14.4.4. Within thirty (30) days from the date of the execution of**

this Agreement the Husband shall ~~cause~~ *pay the Wife $4,500.00 for repairs* the air conditioning ducts  in the

marital home, ~~to be replaced and brought up to comply with Miami-Dade~~

~~County building code requirements  and Husband shall provide written~~

~~assurance by a licensed contractor to the Wife that the air conditioning ducts~~

~~are free of asbestos.~~ Husband's cost shall shall not exceed $4,500.00. If the

total cost to replace the ducts and to comply with  Miami-Dade County

building code requirements exceeds $4500.00, the Wife will be responsible for

the balance.

14.5. The Husband shall pay to the Wife the sum of Four Million

($4,000,000.00) Dollars as further equitable distribution under the following terms

and conditions:

14.5.1  One million ( $1,000,000.00) dollars shall be paid no later

than                August 9, 2008; and



14.5.2. One million dollars ($1,000,000.00) dollars shall be paid no later than August 9, 2010; and

14.5.3. One million ($1,000,000.00) dollars shall be paid no later than August 9, 2011; and

14.5.4. One million ($1,000,000.00) dollars shall be paid no later than August 9, 2012.

14.5.5 Husband's obligations to Wife under Sections 14.4.2, 14.5 and 18 of this Agreement, which are the obligations to pay the Ocean Bank credit line, equitable distribution and the alimony payments (the "Secured Obligations") shall be secured by the collateral set forth below (collectively, the "Collateral"):



(a)   In the case of the property located at 333 N.E. 24th Street, Miami, FL, owned by Gallery Art Condominium, LLC, and known as the "Mondrian" (the "Mondrian Project"), Husband will pledge his 50% ownership interest in Gallery Art Holdings, LLC, which in turn owns 50% of Gallery Art Condominium, LLC. The presently existing secured financing with respect to the Mondrian Project is in favor of Ocean Bank and is secured by a first mortgage on the property. As used herein, "ownership interest" means Husband's shares, membership interest or other ownership interest in the company in question.

(b)   In the case of the property located at 7701 N. Kendall Drive, Miami, FL, owned by Dadeland Breezes, LLC (the "Dadeland Project"), Husband will pledge a 49% ownership interest in FGH Holdings, LLC, which in turn owns 50%





(12)

of Dadeland Breezes, LLC. In addition, Husband will pledge his right to receive profits, cash or other distributions (but expressly excluding any customary and reasonable developer and/or overhead fees) (a "Profits Interest") with respect to his remaining ownership interest (11%) in FGH Holdings, LLC. The presently existing secured financing with respect to the Dadeland Project is in favor of Ocean Bank and is secured by a first mortgage on the property.

(c)     With respect to Husband's project located at 60 N.W. Douglas Road, Miami, FL, owned by 100 Douglas LLC (the "Douglas Project"), Wife shall retain title to her 50% ownership interest in H&H Le Jeune LLC, which company owns a 1/3 interest in 100 Douglas Apartments, LLC. In addition, Husband will pledge a Profits Interest with respect to his remaining ownership interest in H&H Le Jeune LLC. The presently existing secured financing with respect to the Douglas Project is (i) a senior loan in favor of Commercebank, N.A. which is secured by a first mortgage on the property, and (ii) a $2,000,000 mezzanine loan in favor of Mazalco Investment Group, Ltd.

(d)     In the case of Husband's project located at 117 NW 42 Street, Miami, FL and owned by BF Hospitality, LLC (the "Mediterranea Project"), Wife shall retain title to her 50% ownership interest in Med Investments, LLC, which owns 50% of Mediterranea LLC, which in turn owns BF Hospitality, LLC. In addition, Husband will pledge a Profits Interest in his remaining ownership interest in Med Investments, LLC. The presently existing secured financing with respect





to the Mediterranea Project is in favor of CF First U, LLC and is secured by a first mortgage on the property.

(e)     In the case of Husband's project located at 187 SE 12 Terrace, Miami, FL and owned by Solaris at Brickell Bay LLC (the "Solaris Project"), Husband will pledge a Profits Interest in his 100% ownership interest in Solaris Holdings, LLC (which shall be expressly subordinate to the pledge already provided to Lehman Brothers), which in turn owns 1/3 of Solaris LLC.  Solaris LLC owns 100% of Solaris at Brickell Bay LLC.  The presently existing secured financing with respect to the Solaris Project is (i) a senior loan in favor of Indymac, which is secured by a first mortgage on the property, and (ii) a $4,000,000 mezzanine loan in favor of Lehman Brothers.



(f)     In the case of Husband's project located at 430 Hibiscus, West Palm Beach, FL, owned by 430 Hibiscus LP (the "Hibiscus Project)", Husband will pledge a 49% ownership interest in HH-430 Hibiscus GP LLC and HH-430 Hibiscus LLC, which companies own an interest in 430 Hibiscus LP.  In addition, Husband will pledge a Profits Interest in his remaining ownership interests in these companies.  The presently existing secured financing with respect to the Hibiscus Project is in favor of First National Bank and Trust Company of the Treasure Coast and is secured by a first mortgage on the property.

(g)     In the case of the property located at 3760 S.W. 40th Street, Miami,





(4)

FL (the "Bird Road Project"), which is presently under contract and is contemplated to be acquired by Husband, Husband will pledge 49% of Husband's ownership interest in any entity that acquires the property. Husband will pledge a Profits Interest in his remaining ownership interest in such company.

(h)     In the case of the 72-foot Ferretti vessel, named "Simplicity" (the "Yacht"), which is owned by Riverfront Holdings Ltd., a BVI Company, Husband will pledge his ownership interest in such company. Husband will use commercially reasonable efforts to obtain the consent of Regions Bank f/k/a Union Planters Bank to the granting of a second mortgage lien on the vessel, subordinated only to the existing first mortgage lien in favor of Regions Bank. In the event Husband is able to obtain Regions Bank's consent within thirty (30) days following the date of this Agreement, Husband will grant to Wife a second mortgage lien on the vessel, and Wife shall release the pledge of the ownership interest in Riverfront Holdings, Ltd.

(i)     In the case of Husband's company Sorrento Real Estate Group, LLC, Husband will pledge his ownership interest in such company.

(j)     In the case of Husband's company H & H Development, Inc., Husband will pledge his ownership interest in such company.

(k)     For purposes of this Agreement, the "Mondrian Project", "Dadeland Project", "Douglas Project", "Mediterranea Project", "Solaris Project", "Hibiscus





(15)

Project", "Bird Road Project" are sometimes referred to herein individually as a "Project" and collectively as the "Projects".

14.5.6    Husband agrees that, until such time as the Secured Obligations are paid in full, (i) Husband shall not incur any additional indebtedness which is secured by an interest in the Projects except only for indebtedness which is to be utilized for the acquisition, pre-development and/or development of the Project(s); (ii) none of the entities described in Section 14.5.5 above (each a "Husband Company" and collectively the "Husband Companies") will incur any additional indebtedness, or encumber or pledge any of its assets, except only for indebtedness which is to be utilized for the acquisition, pre-development and/or development of the Project(s); and (iii) Husband will not grant or permit any lien to exist on any of his ownership interests (the "Husband Shares") in the Husband Companies, or any Profits Interest in such companies, except liens in favor of Wife, liens granted prior to the date hereof and other liens required by the lender(s) to secure indebtedness which is to be utilized for the acquisition, pre-development and/or development of the Project(s).  Notwithstanding the foregoing, with respect to the Douglas Project, Mediterranea Project and the Solaris Project, any additional Project indebtedness permitted under the preceding sentence may only be funded by the existing institutional construction and mezzanine lenders for such Projects. It is the intent of the parties that the profits, cash and other distributions from the Projects (but expressly excluding any customary and reasonable developer and/or







overhead fees) (the "Distributions") shall be applied to pay the Secured Obligations, in the percentages set forth in Section 14.5.7 below. Notwithstanding the foregoing, to the extent that (x) any future lender providing acquisition, construction and/or mezzanine financing for the Project(s) (other than the Douglas Project, Mediterranea Project or Solaris Project) (or any After Acquired Property (as hereinafter defined)), or (y) any institutional equity partner providing funds for the acquisition, pre-development and/or construction of the Projects(s) (other than the Douglas Project, Mediterranea Project or Solaris Project) (or any After Acquired Property), shall require that Husband grant a first lien on 100% of his ownership interest in a Husband Company, Wife shall execute a subordination instrument subordinating the Secured Obligations and her security interests to the Project indebtedness or institutional partner equity contributions and the security interests granted by Husband in connection therewith, and execute and deliver such subordination to the lender(s) and/or institutional equity partners making such requests.

14.5.7   Until the Mortgage in favor of Ocean Bank on Wife's residence at 690 Solano Prado, Coral Gables, FL (the "House Loan") is paid in full, 75% of the Distributions received from Projects by the Husband Companies shall be applied to pay down the House Loan, and the balance shall be paid to Husband. After the House Loan has been paid in full, the Distributions received by the Husband Companies from the Projects shall be applied as follows:  25% of the





Distributions shall be applied to prepay the Secured Obligations (until the Secured Obligations are paid in full), and the balance shall be paid to Husband; provided, however, that any Distributions received or realized by the Husband Companies from the Hibiscus Project shall be applied as follows: 50% to prepay the Secured Obligations, and the balance shall be paid to Husband. Notwithstanding the foregoing, upon the sale of the Yacht or the Bird Road Project (or the contract to purchase such project), 100% of the proceeds of such sale shall be applied to prepay the House Loan (after full payment of the House Loan, proceeds from the Yacht and the Bird Road Project shall be allocated as provided in the second sentence of this Section 14.5.7). Notwithstanding the foregoing, the percentage allocations provided in this Section 14.5.7 shall apply only to Distributions received while Husband is not in default of this Agreement; if Husband defaults hereunder and such default is not cured within the cure periods provided under this Agreement, 100% of the Distributions received by the Husband Companies from the Projects shall be applied to prepay the Secured Obligations and Wife may exercise all other rights and remedies available under Florida law with respect to the Collateral.



14.5.8    With respect to the Husband Companies in which Wife will retain her shares (Douglas Project and Mediterranea Project), such shares shall be transferred and released to Husband, free of all liens, claims or encumbrances, on the earlier of: (i) the date Wife receives her portion of the Distributions payable





18

with respect to such Projects under Section 14.5.7 of this Agreement, so long as Husband is not then in default hereunder (beyond all applicable notice and cure periods); or (ii) the date the Secured Obligations are paid in full. Wife agrees that she will not have the right to grant any security interest or encumbrance upon any shares in a Husband Company retained by Wife.

14.5.9    On the date Wife has received her share of the Distributions for a Project in accordance with Section 14.5.7 above, so long as Husband is not then in default hereunder (beyond all applicable notice and cure periods), Wife shall promptly execute such documents as are necessary or otherwise reasonably requested by Husband to release the portion of the Collateral which pertains to the applicable Project. On the date the Secured Obligations are paid in full, Wife shall promptly execute such documents as are necessary or otherwise reasonably requested by Husband to release all of the Collateral.

14.5.10    Each distribution of the Distributions to Wife hereunder shall be accompanied by a written report from Husband showing, in reasonable detail, the total proceeds received from the project in question, the expenses and disbursements related thereto, and the computation of the amounts paid to Wife. Until such time as the Secured Obligations have been paid in full, Wife shall have the right, not more frequently than once every three (3) months, to audit the books, records and accounts of the Husband Companies and Projects to confirm Husband's compliance with the terms of this Agreement, which audits shall be





(19)

conducted upon reasonable advance written notice and during normal business hours.

14.5.11 The security interests in favor of Wife shall be evidenced by pledges (the "Pledges") which shall be in such form as is reasonably acceptable to Husband and Wife. Such documentation shall be prepared by Wife's counsel. Husband shall sign such UCC-1 Financing Statements, and take such other actions (including delivery of original stock certificates, where applicable), as may be reasonably necessary to perfect Wife's liens in the Collateral (however, Husband shall not be required to obtain any consents from any third parties with respect thereto). Husband shall pay all recording costs, taxes and similar costs with respect to the debts and liens contemplated hereby; however, the parties shall reasonably cooperate to minimize such taxes. Upon any default by Husband under this Agreement or any of the Pledges, which remains uncured beyond applicable cure periods provided under this Agreement, the Secured Obligations which have not been paid shall bear interest at the annual rate equal to the lesser of (i) the prime rate of interest (as published in the Wall Street Journal) plus five (5) percent, or (ii) eighteen percent (18%) per annum.

14.5.12 For so long as the Secured Obligations remain unpaid, Husband shall grant Wife a security interest in 49% of Husband's ownership interest in any entity which acquires other real estate projects or business ventures (collectively, "After Acquired Property"), acquired by Husband after the date hereof, directly or





indirectly. The foregoing pledges shall be deemed to be part of the Collateral. Wife shall receive a first lien security interest on 49% of Husband's stock, LLC or partnership interest, or other ownership interest of Husband in the entity or entities that own the After Acquired Property in question, subject to the provisions of Section 14.5.6 above.

14.6. The Husband shall have sole ownership and possession of the real property located at 1627 SW 37th Avenue, Unit C1, Coral Gables, Florida, Miami-Dade County, Florida, hereinafter referred to as the Gables View condominium.

14.7.    The Husband shall be solely responsible for all the real estate taxes on the Gables View condominium. The real estate taxes prior to 2005 shall be paid by the Husband and/or Gables View within **thirty (30) days** from the execution of this agreement.

14.7.1. The Husband shall immediately list the Gables View condominium for sale and shall use his commercially reasonable efforts to sell or refinance the condominium. The Husband shall be required to pay the Wife the sum of two hundred thousand ($200,000) dollars (in addition to Husband's other financial obligations hereunder) on the earlier of : (a) the date Husband sells the condominium, or (b) 90 days after the date **of the execution to this agreement.** Husband shall mortgage the condominium to Wife to secure the above obligation. Wife shall pay her legal fees, stamp and intangible taxes and recording costs for this mortgage. If the Husband refinances the condominium, he shall pay Wife the




(21)



net proceeds received from the financing (not to exceed $200,000) upon closing thereof, and Wife shall satisfy her mortgage at that time.  If the refinancing does not fully repay the Husband' obligation, Husband will pay the deficiency 90 days after the date **of the execution to this agreement.**

14.7.2 Husband represents and warrants that: (a) the Gables View unit described in this Section 14.7 is the only asset owned by Husband, directly or indirectly, relating to The Gables View project; and (b) the Villa Calabria project has been completed and sold and Husband retains no interest therein or assets related thereto.

14.8. Except as otherwise set forth herein, the Husband shall have sole ownership of the following businesses, and the Wife shall transfer and assign to the Husband all of her rights, title and interest in and to said business interests, if any:



    (1)    Gables View Apartment LLC;

    (2)    Villa Callabria;

    (3)    MED Investments;

    (4)    Gallery Art Holdings, LLC;

    (5)    Gallery Art Condo, LLC;

    (6)    Solaris at Brickell Bay;

    (7)    Dadeland Breezes Apartments, LLC;

    (8)    H & H Development;





(9)    Sorrento Real Estate Group;

(10)    Riverfront Holdings Ltd;

(11)    H&H LeJeune, LLC[1].

(12)    FGH Holdings, LLC.

(13)    Solaris Holdings, LLC

(14)    430 Hibiscus, LP.

14.9. <u>Fisher Island Membership</u>: At the Wife's option, Wife shall have

as her sole and exclusive property the Parties' joint membership at Fisher

Island.  In the event the Wife excercises her option she shall be responsible for

the payment of the dues and any expenses at Fisher Island she incurred after

the signing of this agreement.  The Husband shall be solely responsible for all

expenses incurred by either party prior to the execution of this Agreement.



15. <u>BANK ACCOUNTS:</u>

15.1.  All checking accounts, money market accounts, savings accounts,

presently in the name of the Wife shall be her sole and exclusive property, to wit,

Wachovia, account with ending number 8673.

15.2.  All checking accounts, money market accounts, saving accounts,

presently in the name of the Husband shall be his sole and exclusive property, to

wit, Commerce Bank, account with ending number 8506.

15.3.  All checking accounts, savings account, certificates of deposit or

other bank accounts presently in joint names at Wachovia Bank and Ocean Bank

(23)

*1 Wife will retain her ownership interests in these companies as
collateral for the secured obligations.as set forth in section 14.5.8
Wife will transfer these shares to Husband upon satisfaction of the
condition set forth in Section 14.5.8.

shall be the sole and exclusive property of the Wife, account with ending numbers 7473 and 1906.

15.4.  All checking accounts, savings accounts, certificates of deposit or other bank accounts presently in joint names at Commerce Bank shall be the sole and exclusive property of the Husband, account with ending number 7006.

15.5.  All **other** joint accounts shall be closed within ten (10 ) days of the execution of this Agreement. *& Equally divided between the parties.* III AF

## 16. IRA/Retirement Accounts:

16.1. The Wife shall retain as her sole and exclusive property the IRA's and SEP retirement accounts at Wachovia, whether in Harvey Hernandez  name and or in Vanessa Hernandez  name, accounts ending with numbers 0634, 0639, and 0640.

17. **BANKRUPTCY**: The lump sum payments are not dischargeable in bankruptcy as the payments are a source of support for the Wife.

## 18. ALIMONY:

18.1   Commencing on October 1, 2005  and on the first day of each month thereafter, the Husband shall pay the Wife periodic  alimony in the amount of twenty thousand ($20,000.00) dollars per month until payment of equitable distribution as set forth in the formula in paragraph 18.2 below.  The Husband shall deposit the alimony payments to Wife's bank account no later than 2 p.m on the first day of each month.  The Wife shall maintain an account with a bank with





(24)

a branch located in Miami-Dade County, Florida.

18.2. Equitable distribution payments from the Husband to the Wife which total $4,000,000.00 are scheduled in paragraph 14.5 above. Upon any payment of this lump sum equitable distribution amount, the $20,000.00 alimony obligation shall be reduced by the amount **of income** imputed to said equitable distribution payment. The imputed amount shall be five percent (5%) irrespective of actual market conditions. Thus, by way of example, if the first equitable distribution payment of $1,000,000.00 is effected, there will be an imputation of $50,000.00 of annual earnings or $4,167.00 when converted to a monthly amount. Thus, the subsequent alimony payment shall be reduced from the previous $20,000.00 to $15,833.00. The intention of both the Husband and Wife is that the sum of the alimony payment plus the imputed income shall total $20,000.00 per month.

18.3.   In the event that the Wife has not remarried, the Husband agrees to pay the Wife three thousand six hundred ($3,600.00) dollars per month for twelve months after the equitable distribution has been paid in full; however, the Husband shall be released from this obligation if he pays all of the Secured Obligations in full within five (5) years after the date hereof, whether or not the Wife has remarried.

18.4.   Each party waives any right to modify the term or the amount of the periodic alimony set forth herein, regardless of any change of circumstances of either party, including the remarriage of the Wife, **except as set forth in Paragraph 18.3 regarding the additional payment of $3,600 per month after**



the Husband satisfies the Equitable Distribution payments. *The $3,600 monthly payments set forth in section 18.3 are also non-modifiable.*

18.5.   Periodic alimony paid by the Husband to the Wife shall not be taxable to the Wife and shall be non-deductible to the Husband.

18.6. The Husband *~and Wife* hereby waive any and all right to receive lump sum, permanent, periodic, temporary, rehabilitative or any other form of alimony from ~~the Wife.~~ *each other, except as otherwise set forth in this Agreement.*

19. **DEFAULT BY HUSBAND**: Any of the following events shall be considered a default by the Husband of his obligations under the Agreement:

19.1.1 The Wife has not received any payment of alimony  and/or child support by the 5th day of the month for which said payments are due, or has not received any payment of equitable distribution within twenty (20) days after the date due; provided, that after House Loan is paid in full, the grace period for payments of alimony and child support shall be increased from five (5) days to ten (10) days; or

19.1.2. The Husband fails to maintain/obtain life insurance to secure his payment obligations pursuant to this Agreement; provided, Husband shall have a grace period to make any premium payments equal to thirty (30) days after the date the premium is due; or

19.1.3. The Husband fails to pay the Ocean Bank credit line within the time parameters set forth above; or



19.1.4 The Husband fails to execute the necessary documents set forth in this Agreement providing security to Wife within ten (10) days after drafts thereof are presented to Husband's counsel (or if the parties cannot agree on such documents, within ten (10) days after completion of any mediation/arbitration required under Section 19.3 below); or

19.1.5 The Husband fails to pay any other monetary obligation hereunder within ten (10) days after the date due.

19.2    Upon Husband's failure to pay any amount due hereunder which equals or exceeds $20,000 (or any other amounts that in the aggregate equal or exceed $20,000), Wife shall have the right to accelerate the outstanding balance of Husband's payment obligations under this Agreement, but only if Wife first provides written notice to Husband and Husband fails to cure the default within thirty (30) days after the date of Wife's notice.

19.3    In the event the parties cannot agree on the form and substance of the security documents, the parties must attend mediation with Alison Weinger to resolve the issue.  If the parties come to an impasse at mediation, the parties must then attend binding arbitration with Alison Weinger to serve as binding arbitrator.

20. **LIFE INSURANCE**:

20.1.  The Husband shall maintain and/or obtain a life insurance policy on



(27)

his life to secure his equitable distribution and alimony obligation. The face

amount shall be six million ($6,000,000.00) dollars until such time as the Husband

has fully paid off the Ocean Bank credit line, and at that time the face amount

value shall be reduced to four million ($4,000,000.00) dollars.

20.2    As long as the Husband is required to pay alimony, equitable

distribution and/or child support under this agreement, the Husband shall maintain

said life insurance policy in force. The face value of Husband's life insurance

policy may decrease as his obligations are paid down. *irrevocable life insurance trust the minor children, Alessandra Nicole Hernandez and Harvey Rafael Hernandez, as beneficiaries.*

*The Husband has represented that he has in place an insurance policy for $7 million dollars ($7,800,000), with the*

20.3.   While the Husband is obligated to pay child support under this

agreement, he will maintain the irrevocable trust and the life insurace policy.

Husband shall provide within ten (10) days of the execution of this agreement the

irrevocable trust documents and life insurance policy.

20.4.   Neither party may borrow against, pledge, or otherwise encumber the

foregoing life insurance policy.

20.5.   The Husband shall pay all premiums for said life insurance policy on

a timely basis.

20.6.   The Husband shall forthwith execute and provide copies to the Wife

of whatever documents are required by his life insurance company to designate the

Wife as beneficiary as set forth above and shall forthwith instruct his life insurance

carrier in writing to provide the Wife with such documents and proof of

beneficiary designation. On an annual basis Wife shall receive from the insurance



company documents which show that the life insurance is in full force and effect.

The Husband shall further instruct the life insurance carrier in writing, to notify

the Wife in writing, in the event the Husband fails to pay his premium on a timely

basis which will cause a lapse in coverage. *The Husband shall provide the Wife with a copy of said writing within ten (10) days from the execution of this agreement.*

20.7    In the event the Wife does not receive the foregoing life insurance

proceeds, the Husband's estate shall be obligated to pay the amount of such life

insurance benefits.

## 21. SHARED PARENTAL RESPONSIBILITY:

21.    The Parties shall have shared parental responsibility of their minor

children, the primary physical residence of the children shall be the residence of

the Wife, and the Husband shall have reasonable visitation with the children.

21.1.    From the execution of this agreement, until December 15, 2005, the

Husband shall have the following weekday visitation with the children.

21.1.1 The Husband shall pick up both minor children at the Wife's

residence every Tuesday and Thursday afternoon at 5:00p.m. and return the

children at 8:00 p.m.

21.2    Until December 15, 2005 the Husband shall have both minor

children every

other weekend as follows:

21.2.1 On Saturday, the Husband shall pick up both children from Wife's

residence at 9:30 a.m and return the younger child at 6 p.m. The older child shall



(29)

remain with the Husband until Sunday at 6:00 p.m.

21.2.2 In addition to the foregoing visitation, the Husband may take, within the next fifty (50) days, the Parties' daughter out of town on two separate occasions, each of which shall be for two consecutive overnights. The Husband shall give the Wife five (5) days notice prior to exercising his two consecutive overnights. The out of town trips shall occur on the Husband's weekend and Husband shall provide Wife with complete itinerary prior to departure, including a telephone number where the child can be reached.

21.3. Commencing on December 15, 2005, the Husband shall have the following visitation and access to the minor children:

21.3.1 Overnight Weekend Time Sharing: The Husband shall pick up both minor children at the Wife's residence every other weekend at Saturday at 9:30 a.m. and return the children to the Wife's residence on Sunday at 6:00 p.m.

21.3.2 On March 18, 2007, the date of the parties' son, Harvey Rafael, third birthday, the Husband's overnight weekend time sharing shall change to the following: the Husband shall pick up both minor children at the Wife's residence every other Friday at 5 p.m. and return the children to the Wife's residence on Sunday at 6 p.m.

21.3.3 Weekday Time Sharing: The Husband shall pick up both minor children at the Wife's residence every Tuesday and Thursday afternoon at 5:00 p.m. and return the children at 8:00 p.m.

30



21.4.  Summer Visitation: Commencing 2006, the Husband shall have summer time visitation with the minor children for one half (1/2) of the children's summer recess, either consecutive or non-consecutive, unless otherwise agreed to in writing by the Husband and the Wife.  During any summer vistiation that the child spends with the Husband, if the children are in town, the Wife shall be entitled to dinner visitation with the children each Wednesday evening from 5:00 P.M. until 8:00 P.M.

21.4.1 The Husband shall notify the Wife in writing on or by the first day of April each year as to the date on which he would like to commence his summer visitation with the children and the precise time of such summer visitation will be subject to reasonable agreement between the Parties. The Parties may, by written agreement, change the date for exchange and selection of the summer visitation.



21.5   Thanksgiving:  This holiday begins on Wednesday when the children shall be picked up at their school or mother's residence (before Thanksgiving) and conclude on the following Monday morning when the children shall be delivered back to school or the mother's residence in a punctual manner.  The Parties shall alternate this holiday annually.  The Husband shall have the children in odd numbered years and the Wife shall have the children in even numbered years.

21.6   Christmas/Winter Time Sharing:  Each year the Parties shall alternate Christmas Eve day, December 24th, and Christmas Day, December 25th, in order that neither party be deprived of the Christmas holiday in any given year.





The Husband shall enjoy Christmas Eve day, December 24th, with the children in even numbered years and Christmas Day, December 25th, with the children in odd numbered years. The Wife shall enjoy Christmas Eve day, December 24th, with the children in odd numbered years and Christmas Day, December 25th, with the children in even numbered years. Christmas Eve day visitation shall commence at 10:00 A.M. on December 24th and shall conclude at 10:00 A.M. on Christmas Day, December 25th, when the children shall be delivered in a prompt fashion to the other parent's residence.

21.7    Other than Christmas Eve and Christmas Day, the remainder of the children's Christmas/winter recess shall be equally divided between the Parties with the Husband having the children the first half of the vacation period begining at 5 p.m. the day that school lets out in odd numbered years. In even numbered years the Husband shall have the children the second half of the vacation period begining at 10 a.m. on that day. The holiday shall consist of the day after school ends until the morning school resumes.

21.8    Spring Break: The children's spring break shall also be equally divided between the Parties with the Husband having the children the first half of the vacation period in odd numbered years begining at 6 p.m. the day that school lets out. In even numbered years the Husband shall have the children the second half of the vacation period begining at 10 a.m. that day. The holiday shall consist of the day after school ends until the morning school resumes.





21.9   Easter Sunday: The Parties shall alternate this holiday annually. Easter Sunday visitation shall commence at 9:00 A.M. on Easter Sunday morning and shall conclude the following morning when the children are either delivered back to school in a punctual manner and/or if this holiday should fall during the children's spring break, the children shall remain with the parent that they are residing with for this portion of spring break and/or shall be delivered to the other parent, if the other parent is enjoying their portion of spring break with the children. The Wife shall have the children in odd numbered years and the Husband shall have the children in even numbered years. If Easter Sunday falls during the children's spring break and the children are out-of-town with either parent, the vacationing parent shall not be compelled to bring the children back to town for Easter Sunday visitation with the other parent.



21.10  Birthday Time Sharing: Each year, the children shall spend the Father's birthday with the Father and the Mother's birthday with the Mother. The children's birthdays shall be alternated by the Parties on an annual basis. The Husband shall enjoy overnight birthday visitation with the children on their actual birth date in even numbered years. The Husband shall pick up the Parties' minor children at school or at the mother's residence (at mother's option) and shall deliver the children back to school the next morning in a punctual manner and/or to the Wife's residence, should the children's birthday fall on a weekend and said weekend is not the Husband's weekend for extended overnight visitation with the Parties' minor



children. In odd numbered years, the Wife shall enjoy birthday visitation with the children on their actual birth date. The Wife shall pick up the Parties' minor children at school and shall deliver the children back to school the next morning in a punctual manner and/or to the Husband's residence, should the children's birthday fall on a weekend and said weekend is the Husband's weekend for extended overnight visitation with the Parties' minor children. When appropriate, the Parent holding a birthday party for the child may wish to consider inviting the other parent.

21.11 Mother's Day/Father's Day: Regardless of who might otherwise have time sharing, the Mother shall be entitled to be with the children overnight on Mother's Day, and the Father shall be entitled to be with the children overnight on Father's Day.



21.12 Notice of Telephone Number and Address: Each party shall at all times keep the other apprised of his or her residence and business addresses and telephone numbers so that each can contact the other in the event of emergencies regarding the children. Neither party will use his or her knowledge of the other party's address or phone number to harass or annoy said party.

21.13 Vacations: Each party may have occasion to take vacations away from home, and it is recognized that the vacationing parent may take the minor children along on vacations and/or on weekend trips outside of Miami-Dade County and/or the State of Florida, consideration given to the children's best




(34)

interests.

21.13.1     If either parent travels out-of-town with the children, a general itinerary, flight numbers and times, hotel and/or accommodation address (es) and telephone number(s) shall be provided for the other parent if the children's weekend visitation and/or vacation shall be taken out of town.  Each party will notify the other at the time plans are made, but no less than five (5) days prior to departure, if they intend upon taking the children out of town for a weekend and at least ten (10) days notice if they intend upon taking the children out of town for in excess of three (3) days.

21.14. The children shall have free access and unhampered telephone contact with the other parent during any weekend or extended vacation out of Miami-Dade County and/or the State of Florida.

21.15. Child support shall continue in full during the Husband's visitation.

21.16. A parent shall immediately notify the other parent of any injury or illness of a child that requires medical treatment.  Both parents shall have the right to visit with a child during such illness or injury, notwithstanding any other provision of this Agreement.

21.17. The Husband's visitation shall take place away from the residence of the Wife.

21.18. The Husband shall arrange to pick up and return the children for his visitation.



(35)



21.19. The Husband and Wife are both entitled to all information about the children's medical care and schooling. If one parent obtains a written medical report or school report card about a child, a copy of the report shall be sent to the other party within five days of getting such records.

21.20. The Husband shall provide at least 24 hours notice in the event he cancels weekday visitation or 48 hours notice in the event he cancels weekend visitation, unless an emergency, and two weeks' notice in the event he cancels holiday, *husband shall* *In the event wife had plans to go out of town for the weekend,* *reimburse wife for the expenditures.* visitation. Any visitation cancelled by the Husband shall be forfeited unless the cancellation is caused by illness, extended work hours, or a physical impossibility to pick up the children, and in that case, the Wife shall make all efforts to reschedule the visitation at a mutually agreeable time.

21.21. The children shall continue to be known by the surname of the Husband. They shall not use the surname of any subsequent spouse of the Wife. When used by the children, the words "mother", "father" or their equivalent terms, shall refer only to their natural parents.

21.22. Both parents shall have an active role in the moral, social, economic and educational environment of the children. Both parents shall consult with each other as to the children's religious upbringing, education, social environment and non-emergency health care. Both parents must authorize major medical or dental care of the children, determine their schooling and education, consent to their marriage and consent to their enlistment in the armed forces, which consent shall


(36)


not unreasonably be withheld. These powers shall not be exercised to frustrate or deny the development of the children and the parents shall cooperate to make future plans for the children consistent with the children's best interests. The parents shall attempt to amicably resolve any disputes that may arise.

21.23. Both parents shall encourage the children to maintain contact with the other parent. Both parents shall encourage a feeling of affection between the children and the other parent. Neither parent shall do anything to estrange the children from the other parent, to injure the opinion of the children of the other parent, or to impair the natural development of the children's love and respect for the other parent.

21.24. The parent having physical custody of a child shall meet the child's medical or dental emergencies. Permission of the other parent for emergency treatment is unnecessary.

21.25. In the event of the death or disability of the Wife, the grandparents shall have visitation with the children of at least one weekend per month, and the weekend will begin on Saturday at 9 a.m. and end on Sunday at 6 p.m.

21.26. **RELOCATION:**    Neither party will permanetly remove the minor children from Dade County, Florida without the written consent of the other party or Court order. The parties acknowledge the importance of each of them maintaing close, frequent and regular access and contact with the children, as set forth in the visitation schedule, as well as excersing shared





parental responsability.  The parenting and visitation arrangment is designed to accomplish these stated goals.

22.  <u>CHILD SUPPORT</u>: The Husband shall pay the Wife child support for the minor children in the sum of $2,500.00 per month, per child for a total payment of $5,000.00.

22.1.  The first payment of child support shall be made on October 1, 2005 and shall continue on the first day of each succeeding month until a child for whom support is due reaches the age of 18 years of age, becomes self-supporting, marries, or dies, whichever event occurs first.  In the event that a child for whom child support is owed has not graduated from high school by their 18th birthday, child support shall continue for said child until their high school graduation, but no later than their 19th birthday.

22.1.1.  If, during the time the Husband is obligated to pay child support, either of the children is or becomes mentally or physically disabled to an extent that in the opinion of a competent medical physician the child is incapable of providing for his support, child support shall continue regardless of the child's age or until the disability no longer exists.

22.2.  Child support payments will be deposited into the Wife's bank account by the Husband no later than 2 p.m on the first day of every month.  The Wife shall maintain an account with a bank with a branch located in Miami-Dade County, Florida.

(38)



22.3.   The Husband shall continue to provide medical and dental insurance at his expense for the Parties' minor children while he is obligated to pay child support under this agreement.

22.4.   The Husband and Wife shall each pay 50% of all reasonable and necessary medical, dental, orthodontic, optical, psychological, hospitalization and prescription drug expense for the children which are not covered by insurance while the Husband is obligated to pay child support under this agreement. In all emergency situations, the Husband shall be given notice as soon as reasonably possible. The Wife, when requesting reimbursement from the Husband for any unreimbursed or non-covered medical and/or dental expenses incurred on behalf of the Parties' minor children must provide some reasonable proof, i.e. a bill, or receipt evidencing the expense incurred. The Husband shall reimburse the Wife for 50% of such unreimbursed medical and/or dental expenses within fifteen (15) days of such request.



22.5. The Parties agree that their children may attend summer activities and camp. The parties shall be equally responsible and each shall pay 50% of the cost of summer camps and activities on behalf of the children. Said expenses include registration, room, board, round trip transportation, sporting equipment, camp clothes, field trips, and the like until such time as each child reaches the age of majority, unless otherwise agreed to by the Parties. The Wife shall maintain receipts for expenses incurred on behalf of the children for summer activities and



(39)



summer camp expenses and remit same for reimbursement which shall be made to Wife within fifteen (15) days of such request.

22.6. The Parties agree that their children may engage in extracurricular activities. The Parties shall be equally responsble and each shall pay 50% of the cost of the children's extracurricular activities, including registration, uniform, and special event fees and costs. Neither party shall unreasonably withhold their consent to the children's enrollment in a particular extracurricular activity. The Wife shall maintain receipts for expenses incurred on behalf of the children for extracurricular activities; reimbursement to Wife shall be made within fifteen (15) days of Wife's request.

22.7. The Parties shall jointly decide upon the children's private school education. The parties agree that the children may attend any of the following schools for Nursery, Kindergarten, elementary, middle school and high school: Alexander Montessori, St. Thomas Episcopal, Gulliver, Palmer Trinity, Belen or Ransom Everglades. The Husband shall pay 100% of the cost for private schooling and the expenses associated therewith including registration, tuition, laptops and fees for the minor children. **The Wife shall pay for the books and school uniform for both children. The Wife shall maintain receipts for expenses incurred on behalf of the children for their education; reimbursement to Wife shall be made within fifteen (15) days of Wife's request.**





22.8. Each party shall pay 50% of the expenses of a college education for both children at a Florida state university.  Expenses including but not limited to tuition, room and board, books, lab fees, supplies, a reasonable allowance and transportation to and from home.  The parties shall purchase and each shall pay 50% of the expenses for a Florida prepaid college plan within sixty (60) days of the execution of this agreement for each of the minor children which shall include but is not limited to tuition, room and board and local fee plans for a four (4) year university.

## 23. PROFESSIONAL FEES, COSTS AND SUIT MONIES:

Except as specifically provided herein,  each party shall bear their own attorney's fees and costs, accounting fees and costs, and experts' fees and costs, related to this dissolution of marriage proceeding.  The  Husband shall pay (in addition to the prior temporary attorney fee payment already made by the Husband), $350,0000.00 by cashier's check paid to the trust account of Wife's lawyers, Barranco, Kircher &Vogelsang, P.A. as follows: $250,000.00 shall be paid on or before noon (12 p.m.) on *TUESDAY* September *20* 2005, and $100,000.00 shall be paid on or before by noon (12 p.m.) September 23, 2005.  Wife shall be responsible for  the balance of her attorney's fees and costs.

## 24. FEDERAL INCOME TAX:

24.1. The Parties shall file 2004 federal income taxes as married filing separately.  Husband shall be responsible for, and include in his personal return, all



taxable income flowing through from any K-1 or otherwise for calendar years 2004 and 2005 and the Husband shall hold the Wife harmless from any tax liabilities, penalties or interest resulting therefrom.

24.2. The Wife shall be entitled to declare the Parties' children as dependents on her federal income tax return **every year**.

24.3. The Husband agrees to and shall indemnify and hold the Wife harmless from all and any penalties, interest, additional tax or other financial obligations which may be due to the Internal Revenue Service as a result of his income and deductions in all joint tax returns filed by the Parties during their marriage.  The Husband shall pay all reasonable costs and fees, including but not limited to attorneys fees and accountant fees,  respecting any necessary proceedings, either administrative or judicial, including any appeals from decisions or administrative bodies and/or lower courts or appellate courts in connection with his income and deductions in any joint tax returns filed by the Parties.



25.  **DEBTS**:

25.1 Except as specified in this Agreement, all debts and obligations incurred by or

incurred by or

in the name of the Wife shall be her sole responsibility, and she shall indemnify and hold the Husband harmless with respect thereto.

25.2   Except as specified in this Agreement, all debts and obligations incurred by or in the name of the Husband or his various business enterprises shall be his sole




(42)

responsibility, and he shall indemnify and hold the Wife harmless with respect thereto.

25.3.   The Wife represents that she is not in possession of any credit card, either in the Husband's name or the joint names of the Parties. In the event that the Wife is in possession of any such credit cards, she agrees that simultaneous with the execution of this agreement, the Wife shall return forthwith to the Husband all credit cards, which she holds in the Husband's name. All joint credit cards of the Parties shall be closed.

25.4.   The Husband represents that he is not in possession of any credit card, either in the Wife's name or the joint names of the Parties. In the event that the Husband is in possession of any such credit cards, he agrees that simultaneous with the execution of this agreement, the Husband shall return forthwith to the Wife all credit cards which he holds in the Wife's name. All joint credit cards of the Parties shall be closed.

25.5. The Husband is assuming all marital liabilities through the signing of this Agreement unless delineated to the contrary in this Agreement.

25.6. The parties shall maintain the current Temporary Support Agreement until the execution of this Agreement or through a Final Judgment.

26. **Effective Date**: The effective date of this Agreement is the date set forth on page one hereof.

27. **Subsequently Discovered Assets**: In the event either party discovers



additional marital assets which were in existence on the date this Agreement was signed, but were not disclosed by the other party, the other party shall immediately receive, as additional equitable distribution, fifty (50%) percent of the fair market value of the asset. ~~In the event Wife incurs attorneys' fees, suit monies and costs in connection with enforcement of this provision, the Husband shall be solely responsible for payment of same.~~

28. **Enforcement**. Should it be necessary for either party hereto to seek enforcement of this Agreement whether through court proceedings, the prevailing party shall be entitled to recover from the other party all attorneys' fees and costs incurred in said enforcement proceedings. This shall include enforcement of Paragraph 27 of this Agreement.

29.     **Authorship**. In the event that it becomes necessary for any reason to construe this Agreement as permitted by the Rules of Evidence of the State of Florida, this Agreement will be construed as being jointly prepared and written by all Parties hereto.

30.     **Possible Invalidity**. In case any provisions of this Marital Settlement Agreement shall be held contrary to, or invalid, under the law of any country, state or other jurisdiction, such illegality or invalidity shall not affect any other provisions hereof, all of which shall continue, nevertheless, and remain in full force and effect; and provisions which are held to be illegal or invalid in any country, state or other jurisdiction shall, nevertheless, remain in full force and effect in any country, state or jurisdiction in which such provisions are legal and







valid.

31.    <u>**WAIVER OF MEDIATION PRIVILEGE**</u>:  In the event there is

any future litigation to set aside this agreement and/or litigation regarding the *→ or any litigation involving the issues in*

interpretation of this Agreement, each of the parties agree that the mediation *this agreement*

and confidentiality privleges are waived, *and the attorneys may testify.*

32.    <u>Representation</u>: The Parties Agreement to Each Other

32.1    Each party has read this agreement and is fully aware of its  rights

and

obligations. Each party is fully aware of the legal effect of this agreement and

acknowledges that it is a complete settlement of all issues between them.

32.2.    Each party shall execute any document necessary to effectuate this

agreement.

32.3.    Each party has had the advice or the right to the advice of

independent legal counsel. The Wife has been represented by Barranco, Kircher &

Vogelsang, P.A.  The Husband has been represented by Kutner & Associates, P.A.

32.4.    Both Parties have had the opportunity to retain tax attorneys or

accountants or tax advisors with reference to the tax implications of this

agreement.  Both Parties acknowledge that they have not relied upon their

respective attorneys for tax advice.  Both Parties acknowledge that they have been

advised to seek their own independent tax advice by retaining a tax attorney, an

accountant, or a tax advisor.







32.5.   Both Parties have disclosed to each other their assets, debts, income and the value of their property to induce the other party to enter into this Agreement.

32.6.   This Agreement is complete and supersedes any prior agreements between the Parties.  No other agreement exists between the Parties.  No subsequent agreement between the Parties is valid unless in writing and signed by both Parties.

32.7.   Each party waives any right either may have to modify any provision of this agreement, including the amount and term of periodic alimony.

32.8.   The failure of a party to insist on strict performance of this agreement shall not waive breach of any other provision of this agreement.

32.9.   The laws of Florida shall govern the validity, construction, interpretation and effect of this Agreement.

32.10. Jurisdiction and venue shall remain in Miami-Dade County, Florida.

32.11. While either party, pursuant to this agreement,  has a financial obligation to the other party or while either of the Parties' children are minors, each party shall notify the other by certified mail of any change of their home address within 15 days of such change.

_____
Beth T. Vogelsang

As to the WIFE

_____
Vanessa Hernandez

(46)

As to the HUSBAND _Siomara Costro_          Harvey Hernandez

STATE OF FLORIDA )
COUNTY OF MIAMI-DADE )

   I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared VANESSA HERNANDEZ, who produced _____ as identification and who did take an oath and who executed the foregoing instrument and she acknowledged before me that she executed the same.

   WITNESS my hand and official seal in the County and State last aforesaid this 16th day of _September_, 2005.

NICOLE A. PUENTES
MY COMMISSION # DD 141487
EXPIRES: August 12, 2006
Bonded Thru Notary Public Underwriters -

NOTARY PUBLIC, STATE OF
FLORIDA

My Commission Expires: August 12, 2006.

STATE OF FLORIDA )
COUNTY OF MIAMI-DADE )

   I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared HARVEY HERNANDEZ, who ~~produced~~ is personally known to me ~~as identification~~ and who did take an oath and who executed the foregoing instrument and he acknowledged before me that he executed the same. September 15, 2005

Emily Joyce Phillips
MY COMMISSION # DD188425 EXPIRES
February 25, 2007
BONDED THRU TROY FAIN INSURANCE, INC.

NOTARY PUBLIC, STATE OF

FLORIDA

My Commission Expires:


(47)



## EXHIBIT "A"

1. One (1) photograph belonging to Harvey Hernandez' mother.

2. Harvey Hernandez' mothers glasses, a toilet cover, a crucifix, and newspaper clipping of
   her obituary.

3. Nouvorania 14' Dinghy with 70 HP Yamaha engine 4 stroke.

4. Bang & Olufsen Sound System and two (2) Bang & Olufsen Speakers.



